UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARIN EDWIN PAPE, | |
| Plaintiff, | 23 Civ. 8401 (KPF) |
| -v.- | **OPINION AND ORDER** |
| BODUM USA, INC., | |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Darin Edwin Pape brought this products liability action against

Defendant Bodum USA, Inc. ("Bodum"), alleging that defects in Bodum's coffee

press caused him injury when the press's glass shattered and hot water spilled

onto his body.  Before the Court are Defendant's motion to exclude the

testimony of Plaintiff's expert and Defendant's motion for summary judgment

under Federal Rule of Civil Procedure 56.  For the reasons set forth below, the

Court denies both motions.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Incident

On October 4, 2021, Mr. Pape made coffee at home using a Bodum Brazil

French Press ("French Press") that his wife had purchased a few months

---

[1]    This Opinion draws its facts primarily from Plaintiff's Complaint ("Compl." (Dkt. #1)),
the operative pleading in this matter, and from the parties' submissions in connection
with Defendant's motion to exclude expert testimony and motion for summary
judgment.  Those submissions include: Defendant's Rule 56.1 Statement of Material
Facts ("Def. 56.1" (Dkt. #42-1)); the Declaration of Jason A. Wheeler ("Wheeler Decl."
(Dkt. #42)) in support of Defendant's motion, as well as the exhibits attached thereto
("Wheeler Decl., Ex. [ ]"); Plaintiff's Rule 56.1 Statement of Material Facts ("Pl. 56.1"

earlier.  (Def. 56.1 ¶¶ 1-2).  Mr. Pape used the French Press on a daily basis and was the only person in his household to use it.  (*Id.* ¶¶ 3-4).  That morning, he ground coffee beans, boiled water, placed the coffee grounds in the carafe of the French Press, poured hot water into the carafe, let the coffee grounds saturate for approximately four minutes, and pushed down the plunger — all according to Bodum's warnings and instructions for using the French Press. (*Id.* ¶¶ 8, 10-11).  When Mr. Pape pushed the plunger about halfway down the carafe, the glass of the French Press fractured, causing a segment of glass to break away from the upper half of the carafe and hot water and coffee grounds to spill onto the right side of Mr. Pape's torso.  (*Id.* ¶¶ 14-17).

Within 15 minutes of the incident, Mr. Pape's wife drove him to the emergency department of a nearby hospital.  (Def. 56.1 ¶ 20).  There, Mr. Pape was diagnosed with second-degree burns to approximately two percent of his total body surface area.  (*Id.* ¶ 23).  He was sent home from the hospital the

---

(Dkt. #44-1)); the Declaration of Adam J. Kress ("Kress Decl." (Dkt. #44)) in opposition to Defendant's motion, as well as the exhibits attached thereto ("Kress Decl., Ex. [ ]"); and Defendant's Response to Plaintiff's Rule 56.1 Statement of Material Facts ("Def. 56.1 Resp." (Dkt. #45)).

Citations to the parties' Rule 56.1 Statements incorporate by reference the documents and deposition testimony cited therein.  *See* Local Rule 56.1(d).  In general, where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court considers such facts to be true.  *See* Local Rule 56.1(c), (d); *Biberaj* v. *Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." (internal quotation marks omitted) (quoting *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009))).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to exclude expert testimony and motion for summary judgment as "Def. Br." (Dkt. #41), to Plaintiff's memorandum of law in opposition to Defendant's motions as "Pl. Opp." (Dkt. #43), and to Defendant's reply memorandum of law as "Def. Reply" (Dkt. #46).

same day, though he received follow-up treatment for his burn injury on October 7 and October 13, 2021.  (*Id.* ¶¶ 21-22).  According to Mr. Pape, the incident resulted in $5,520.09 in out-of-pocket medical expenses and $2,836.65 in lost wages due to 19 hours of sick leave.  (*Id.* ¶¶ 27-28).

After he returned home from the emergency room on October 4, 2021, Mr. Pape threw away the broken glass but preserved the broken French Press itself, which was later shipped to the parties' experts for their inspection.  (Def. 56.1 ¶¶ 30-32).

### 2.    The Expert Testimony of Mingxi Zheng

While both parties have retained experts to analyze the fracture — Mingxi Zheng, M.S., P.E. for Plaintiff and Gabriel Ganot, Ph.D., P.E., CWI for Defendant — the Court focuses on Ms. Zheng because her expert testimony is the only one at issue here.  (*See* Kress Decl., Ex. C ("Zheng Expert Report"); Wheeler Decl., Ex. E ("Ganot Expert Report")).

Ms. Zheng has eight years of experience in the field of materials science. (Zheng Expert Report 3).  She received a Bachelor of Science degree as well as a Master of Science degree in Materials Science and Engineering, both from the University of California, Berkeley.  (*Id.*).  She is currently employed as an engineer at Berkeley Engineering and Research, Inc. ("BEAR").  (*Id.*).

In July 2024, Ms. Zheng participated in a joint inspection of the French Press with Bodum's expert, Dr. Ganot.  (Zheng Expert Report 4; Def. 56.1 ¶ 36).  From her physical inspection, Ms. Zheng observed "crack patterns with little to no branching" and "cracks that form (near) 90[-degree] angles with both

3

the edge and the surface of the glass," both of which she described in her expert report as "[g]lass failures from thermal stresses." (Zheng Expert Report 5). She also undertook Keyence imaging[2] of the French Press, which showed "Wallner lines [that] point towards a crack origin at the inner surface" of the French Press as well as "twist hackle marks" and "hackle lines." (*Id.* at 6-7; *see also* Def. 56.1 ¶¶ 55-56, 60-62 (explaining Wallner lines and hackle marks)). In addition, the Keyence imaging revealed "many air bubbles within the glass," including a crack origin located within the body of the glass in the form of a bubble. (Zheng Expert Report 7-9). Ms. Zheng explained that "[a]ir bubbles such as these compromise the integrity of the glass and degrade its overall performance under normal use." (*Id.* at 9). She added that "[a]ir or gas bubbles can remain trapped within glass during the manufacturing process when molten glass is not properly fined during the melt process." (*Id.*).

Finally, upon inspecting the subject plunger, Ms. Zheng explained that it "applies mechanical stress to the carafe during normal use." (Zheng Expert Report 11). Specifically, "[t]he plunger creates an axisymmetric radial loading condition onto the carafe, which puts areas in local bending, creating areas of tension." (*Id.*). Ms. Zheng also found "an anomaly in the coil that extends beyond the implied design circumference," resulting in "a sharp corner of steel wire sticking out and expanding the effective circumference of the plunger." (*Id.* at 11). She explained in her expert report that "this expanded

---

[2]     Keyence is a brand of digital microscope. (*See* Zheng Expert Report 5; Ganot Expert Report 5).

circumference means that this coil is pushing ... with extra force in a localized area against the internal surface of the carafe." (*Id.*).  She also looked at an image of a replacement part on Bodum's website, which image showed the same protrusion and indicated to her that "this [protrusion] is the normal presentation of this part."  (*Id.*).

Based on her physical inspection, Keyence imaging, and additional scientific research, Ms. Zheng concluded "with a reasonable degree of engineering certainty" that:

- The subject French press failed as result of defective glass and a combination of mechanical and thermal stresses.

- The subject French press is defective and failed due to air bubbles present within the glass carafe.  At least one of these air bubbles was a crack initiation site for this failure.  These air bubbles are, more likely than not, a manufacturing defect from the manufacturing process.

- The subject French press failed due to thermal stress as indicated by the 90-degree angles of the fracture pattern and minimal branching of cracks.

- The subject French press failed due to mechanical stresses exerted on it by the plunger.

- The subject French press is defective in that the plunger design includes a metallic plate with a protruding stainless-steel wire that exposed the inside of the glass carafe to asymmetrical pressure from the plunger, and to a sharp metal edge that could compromise the glass.

- A proper quality control process would have prevented this accident by properly identifying the defective carafe and removing it from sale.  Quality control inspections are standard after forming and before shipping and sale of a product in glass manufacturing.  This defect was visually simple to detect.

- These defects directly relate to and caused the injuries experienced by Mr. Pape.

(Zheng Expert Report 13; *see id.* at 3).  In sum, Ms. Zheng opined that a combination of (i) a manufacturing defect that allowed air bubbles to form within the French Press's glass carafe, (ii) a design defect that allowed for direct contact between a protruding steel wire in the plunger and the French Press's glass carafe, and (iii) thermal and mechanical stress from normal use of the French Press led the product to "ultimately fail." (*Id.* at 3).  Ms. Zheng was later deposed by Bodum's counsel regarding her expert opinion.  (*See* Kress Decl., Ex. D).

## B.    Procedural Background

On September 22, 2023, Mr. Pape filed a Complaint in this Court against Bodum.  (Dkt. #1).  Because Mr. Pape is a resident and citizen of California and Bodum is a New York corporation with its principal place of business in New York, and because Mr. Pape is seeking an amount in controversy in excess of $75,000, this Court has diversity jurisdiction over the case.  *See* 28 U.S.C. § 1332.  (Compl. ¶¶ 6-8).  In the Complaint, Mr. Pape brought four common-law claims of products liability against Bodum: (i) strict liability, (ii) negligence, (iii) negligent design defect, and (iv) negligent failure to warn.  (*Id.* ¶¶ 19-40).[3]

Bodum answered on October 24, 2023.  (Dkt. #10).  The parties then engaged in extensive settlement discussions, including before Magistrate Judge

---

[3]    In his opposition, Mr. Pape concedes his failure-to-warn claim; the Court therefore dismisses the claim and does not consider it in the Court's analysis.  (Pl. Opp. 2 n.1, 19).

6

Stewart D. Aaron on this Court's referral, but ultimately to no avail.  (*See* Dkt. #11, 13, 18, 20, 22, 24, 30-31).  Concurrent with their settlement negotiation, the parties also proceeded with discovery based on a Case Management Plan approved by the Court.  (*See* Dkt. #27).  On May 9, 2025, Bodum filed a pre-motion letter in anticipation of moving to exclude the expert testimony of Ms. Zheng and for summary judgment.  (Dkt. #36).  The Court held a pre-motion conference on May 27, 2025, to address Bodum's anticipated motions.  (Dkt. #38; May 27, 2025 Minute Entry).

According to the briefing schedule set by the Court, Bodum filed its motions to exclude Ms. Zheng's expert testimony and for summary judgment as well as supporting papers on August 1, 2025.  (Dkt. #39, 41-42; *see* May 27, 2025 Minute Entry).  Mr. Pape filed his opposition and supporting papers on September 5, 2025.  (Dkt. #43-44).  And on September 19, 2025, Bodum filed its reply, along with a response to Mr. Pape's Rule 56.1 Statement of Additional Material Facts.  (Dkt. #45-46).

**DISCUSSION**

**A.    The Court Denies Defendant's Motion to Exclude the Expert Testimony of Ms. Zheng**

   **1.    Applicable Law**

The Supreme Court has assigned federal district courts a "gatekeeping" role with respect to expert testimony.  *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (holding that it is the district court's responsibility to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand").  This gatekeeping function applies whether the

7

expert testimony is based on scientific, technical, or other specialized knowledge. *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 147 (1999) (citing Fed. R. Evid. 702). "It is well-established that 'the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]'" *Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Salem* v. *U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

Expert testimony is primarily governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court's inquiry thus focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the expert opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will assist the trier of fact. *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007). If "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Nevertheless, testimony that falls within "the range where experts might reasonably differ" should be admitted to allow the jury — and not the Court — to assess the weight and sufficiency of the evidence. *Kumho Tire*, 526 U.S. at 153. Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 2. Ms. Zheng's Expert Testimony Is Admissible

#### a. Ms. Zheng Is Qualified as an Expert

According to her *curriculum vitae,* Ms. Zheng is a licensed professional mechanical engineer in the state of California with a specialty in "metallurgy, fracture mechanics[,] and failure analysis." (Kress Decl., Ex. F). She received degrees in materials science and engineering, she has been employed as a materials scientist and mechanical engineer at various reputable institutions, and she currently works in that capacity at BEAR. (*Id.*). As Mr. Pape points out, Bodum "has not challenged Ms. Zheng's qualifications as a mechanical engineer and has no credible basis to do so." (Pl. Opp. 10). The Court agrees

that Ms. Zheng is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

### b.   Ms. Zheng's Expert Testimony Is Reliable

In determining whether expert testimony is reliable, the Court considers "the indicia of reliability identified in Rule 702" — namely "[i] that the testimony is grounded on sufficient facts or data; [ii] that the testimony 'is the product of reliable principles and methods'; and [iii] that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702(b)-(d)).  In addition, the Supreme Court has identified

> a number of factors bearing on reliability ..., such as [i] whether a theory or technique "can be (and has been) tested"; [ii] "whether the theory or technique has been subjected to peer review and publication"; [iii] a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and [iv] whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Id.* at 266 (quoting *Daubert*, 509 U.S. at 593-94).  None of those factors is "definitive," as the reliability inquiry is a "flexible one."  *Daubert*, 509 U.S. at 593-94.  And the Court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the [Court's own] belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266.

Nevertheless, "the Court is not required to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and may instead

conclude that "there is simply too great an analytical gap between the data and the opinion proffered." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 15 Civ. 1626 (JMF), 2017 WL 6729295, at *5 (S.D.N.Y. Dec. 28, 2017) (internal quotation marks omitted) (quoting *Gen. Elec. Co.* v. *Joiner,* 522 U.S. 136, 146 (1997)).  Furthermore, "pure speculation, untethered to the facts in the record, is not a proper basis for reliable scientific testimony." *Id.* at *9.

In this case, Bodum primarily contends that Ms. Zheng's conclusions are speculative because she has not tested her hypotheses or provided adequate support from the record. (Def. Br. 15-21).  According to Bodum, "Ms. Zheng's opinions are devoid of reliable calculations, testing, or experimentation that was reliably applied to the facts of the case, and accordingly, her testimony requires exclusion." (*Id.* at 15).  Bodum takes issue with both Ms. Zheng's overall conclusion that the combination of thermal stress, air bubbles, and mechanical stress from the plunger (the latter of which is alleged to be defective due to the protruding coil) resulted in the fracture, as well as with each component of that conclusion. (*Id.* at 15-21).  The Court starts by addressing the individual components and then evaluates their combined effect.

*First,* Bodum claims that Ms. Zheng provides no support for her conclusion that thermal stress contributed to the fracture. (Def. Br. 17-18; *see* Def. Reply 5-6).  Specifically, Bodum discredits Ms. Zheng's evidence of thermal stress in her expert report as "a measly *three sentences* citing little to no branching and cracks forming at 90-degree angles." (*Id.* at 17).  Bodum adds that Ms. Zheng fails to connect her conclusion to the existing facts because she

11

agrees with the defense that hot water did not reach the lip of the carafe, which Bodum believes to be the site of the fracture. (*Id.* at 17-18). Consequently, Bodum argues that "[t]here is a complete lack of testing or factual application to support Ms. Zheng's conclusion that thermal stress caused or contributed to the fracture at the origin." (*Id.* at 17).

While Bodum may disagree with the strength or even the accuracy of Ms. Zheng's conclusion about thermal stress, the Court determines that her opinion is based on factual evidence observed in the subject carafe as well as her own scientific expertise and research. To begin, Ms. Zheng reaches her conclusion upon conducting a physical examination of the French Press as well as Keyence imaging of certain sections of the French Press, both of which revealed crack patterns with little to no branching, cracks that form right angles with the edge and the surface of the glass, and "Wallner lines [that] point towards a crack origin at the inner surface of [the French Press]." (Zheng Expert Report 5-6; *see* Pl. Opp. 11, 14). Furthermore, Ms. Zheng cites two studies on glass fractography for the proposition that thermal stress tends to cause the crack patterns and cracks that she has observed in the French Press. (Zheng Expert Report 5 n.1-2). Contrary to Bodum's characterization, Ms. Zheng's opinion about thermal stress as a contributing factor is supported by actual observations that she has made of the French Press combined with research on common signs of thermal stress in glass. *Cf. Guerrero* v. *Loiacono*, 769 F. Supp. 3d 158, 172-73 (E.D.N.Y. 2024) (finding expert testimony to be unreliable because he did not base his conclusion on "any specific observation

of [the] [p]laintiff[ ] and not on any study or medical source" (internal quotation marks omitted)).

That Ms. Zheng did not perform a thermal stress test, calculate the quantitative threshold for thermally induced fractures, or provide a satisfying explanation for thermal contact at the lip of the carafe does not render her testimony unreliable. As Mr. Pape agrees, Bodum is welcome to explore the issues of testing and quantitative calculations on cross-examination, but Ms. Zheng's failure to "perform some 'essential' tests or measurements ... go to the weight of [her] testimony, not its admissibility." *Argonaut Ins. Co.* v. *Samsung Heavy Indus. Co. Ltd.*, 929 F. Supp. 2d 159, 170 (N.D.N.Y. 2013); *see Figueroa* v. *Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 368-69 (S.D.N.Y. 2003). (Pl. Opp. 15). More critically, while Ms. Zheng agrees with the defense that hot water likely did not reach the fracture site at the time of the fracture, she makes clear that "[t]hat doesn't mean that the thermal effects [did not] reach other locations on the glass." (Kress Decl., Ex. D at 140, 142). She adds that she does not "know if there was direct contact, but [the glass was] exposed to the temperature of the water," and she continues to believe that the French Press was "under some thermal stress during [its] failure." (*Id.* at 143, 145). Given the existing (albeit meager) factual observations and research support for Ms. Zheng's conclusion about thermal stress, the Court cannot exclude that part of her expert testimony at this stage of the litigation.

*Second*, Bodum contests Ms. Zheng's air bubble theory, once again arguing that it is not rooted in adequate testing or fact. (Def. Br. 19-20; Def.

Reply 4-5).  According to Bodum, "Ms. Zheng fails to explain not only how she determined [that the fracture site] was a preexisting air bubble, but … [also] how such an air bubble (if it existed) would sufficiently weaken the glass to result in the subject fracture." (Def. Br. 19).  On the first point, Bodum references Ms. Zheng's deposition, during which she agreed that "glass bubbles [that form naturally] in molten glass must be round and uniform" (Def. Reply 4), and contends that her deposition admission contradicts her air bubble theory because "the fracture site is jagged and has fracture surface markings, which confirms [that] there was no preexisting bubble because such a surface would have been smooth" (Def. Br. 19).  And on the second point, Bodum argues that even if there were a preexisting air bubble at the fracture site, Ms. Zheng has not demonstrated through "testing, analysis, or experimentation" how it would affect the tensile strength of the glass and sufficiently weaken the glass to lead to a fracture.  (*Id.* at 19-20).  As a result, Bodum claims that "Ms. Zheng's opinions on glass bubbles are … entirely speculative, resting upon no data, are impermissibly based on *ipse dixit* alone, and thus require exclusion."  (*Id.* at 20).

The Court is sympathetic to Bodum's criticisms of the gaps in Ms. Zheng's air bubble theory, but it ultimately finds that her opinion is not so "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison[.]"  *Better Holdco, Inc.* v. *Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Zerega Ave.*

14

*Realty Corp.* v. *Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)).  Put differently, "[a]ll of [Bodum's] arguments attacking [Ms. Zheng's] analysis go to the weight and not the admissibility of [her] proffered testimony, and none presents a basis for exclusion." *Id.*

The Court begins with the process by which Ms. Zheng determines that there were air bubbles that compromised the integrity of the glass and contributed to the French Press's fracture.  She first observes and documents several air bubbles in the French Press through Keyence imaging.  (Zheng Expert Report 7-9).  She then explains — based on her own experience, as well as research produced by the United States Environmental Protection Agency ("EPA") and academic institutions — that air bubbles can form during the glass manufacturing process "when molten glass is not properly fined during the melt process." (*Id.* at 9-10; *see* Pl. Opp. 11-12).  Similar to her opinion about thermal stress, her air bubble theory also relies on a combination of factual observations and existing research to reach the conclusion that "[i]n the case of this French [P]ress, something, more likely than not, went wrong in [the melting] step of the process and allowed bubbles to remain," which in turn "compromise[d] the integrity and performance of the glass." (Zheng Expert Report 9-10).  Although her assumptions may be too general, they are not "so unrealistic and contradictory" as to render her air bubble theory unreliable. *Better Holdco*, 666 F. Supp. 3d at 355 (internal quotation marks omitted) (quoting *Zerega Ave. Realty Corp.*, 571 F.3d at 214).

On the issue of the shape of the specific air bubble at the fracture site, Ms. Zheng's supposedly contradictory deposition testimony does not defeat her overall conclusion.  During her deposition, Ms. Zheng agreed that air bubbles that form naturally in materials are generally "smooth" in appearance, and that the particular air bubble observed in the French Press had "jagged edges" and could be interpreted as evidence of a "secondary fracture" rather than the initiation site of the original fracture.  (Kress Decl., Ex. D at 160-62). Nevertheless, she explained that "in kinetics not everything is a perfect circle … in reality[,]" and that her report is based on "what [she] believe[s] [to be] more likely than not with [the] information [she has]."  (*Id.* at 162-63).  In other words, Ms. Zheng acknowledged the existence of an alternative explanation, and that explanation could prove to be more persuasive to the jury at the end of the day, but the possibility of a better explanation does not mean that the Court must exclude Ms. Zheng's otherwise fact- and research-based conclusion at this point.  Moreover, Ms. Zheng emphasized during her deposition that "it's the presence of many, many [air] bubbles that … [form] the basis of [her] opinions in this report."  (*Id.* at 148).  Even if an air bubble did not exist at the fracture site, that does not defeat her conclusion that other air bubbles — which she believes to be manufacturing defects — had "an impact on the bulk material properties" of the French Press.  (*Id.* at 182).

In addition, the lack of any testing, calculations, or analysis of the effect of air bubble dimensions on the tensile strength of glass undermines the weight but not the admissibility of Ms. Zheng's expert testimony.  As the Court

16

has already explained with respect to the thermal stress conclusion, Ms. Zheng's failure to perform experiments and calculations is not fatal.  The Court acknowledges that in some cases where experts put forward novel theories, the existence of data and testing could be dispositive for admissibility.  *See, e.g.*, *Tramontane* v. *Home Depot U.S.A, Inc.*, No. 15 Civ. 8528 (NSR), 2018 WL 4572254, at *6 (S.D.N.Y. Sept. 24, 2018) (determining expert testimony to be "impermissibly based on his *ipse dixit* alone" because he failed to provide any data to support his novel theory that porosity in a ladder "at any level [can be] problematic"); *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 270 (S.D.N.Y. 2018) (finding expert's "novel and untested theory" to be unreliable because he "was not able to identify any peer-reviewed publication … [or] any presentation to this effect at a scientific conference supportive of this theory"), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

But in this case, Ms. Zheng's air bubble theory itself is not novel, as she cites studies by the EPA and other institutions about the formation of air bubbles in the glass manufacturing process and explains that "for a borosilicate glass product, [air] bubbles are generally considered a non-conformity [because] they are known to compromise the integrity and performance of the glass." (Zheng Expert Report 9-11).  Bodum does not challenge the fact that air bubbles can form during the manufacturing process or the theory that unremoved air bubbles can jeopardize the quality of glass products.  Therefore, the failure to test this theory alone does not transform Ms. Zheng's expert testimony into an impermissible *ipse dixit* opinion.

*Third*, Bodum takes issue with Ms. Zheng's expert opinion about the plunger, namely that the mechanical stress from the plunger as well as the protruding metal coil in the plunger contributed to the fracture. (Def. Br. 18, 20-21; Def. Reply 5). With respect to mechanical stress, Bodum argues that "there is no description as to how mechanical stress from the plunger caused the observed fracture at the lip," and that Ms. Zheng has performed "no calculations, experiments, or simulations to determine the degree of mechanical stress required to be exerted on borosilicate glass to result in fracture at the lip." (Def. Br. 18). And regarding the protruding coil, Bodum claims that "Ms. Zheng does not contend [that] there was in fact any scratching of the inner surface of the carafe caused by an exposed wire, nor does she contend that scratches from [the] exposed wire actually caused or contributed to [the] fracture at the lip of the carafe." (*Id.* at 20).

Although the Court finds Ms. Zheng's plunger conclusions to be especially weak, it once again is constrained to conclude that they meet the relatively low bar for admissibility. Ms. Zheng first explains that "[t]he plunger applies mechanical stress to the carafe during normal use." (Zheng Expert Report 11). But she does not claim that mechanical stress from normal use of the plunger alone contributed to the fracture. Rather, her specific theory is that the protruding coil expanded "the effective circumference of the plunger" and therefore caused the plunger to push "with extra force in a localized area against the internal surface of the carafe." (*Id.*). It is this "extra pressure, along with the air bubbles weakening the carafe's strength overall, and the

18

thermal stresses from normal use[ ] [that] more likely than not led to the failure of the carafe." (*Id.*).  Contrary to Bodum's argument, Ms. Zheng's theory about the expanded circumference does provide a plausible explanation for how extra mechanical stress in a localized area could have contributed to the fracture. *Cf. Northway Med. Ctr. Condo* v. *Hartford Fin. Servs. Grp., Inc.*, 745 F. Supp. 3d 170, 181-82 (S.D.N.Y. 2024) (finding expert testimony to be inadmissible because the expert left "the Court asking *how* a sudden influx of water during [an] alleged singular weather-based event resulted in the outward bulging of the veneer wall").  And because that theory is not novel or based on outlandish assumptions, Ms. Zheng's lack of testing is not dispositive.

Moreover, Ms. Zheng's theory does not rely on actual scratching of the inner surface of the French Press.  While her expert report does mention the "damage risk from the exposure of a sharp object to the inside surface" of the French Press and that "a sharp metal edge … could compromise the glass," Ms. Zheng's conclusion is that the protruding coil "exposed the inside of the glass carafe to asymmetrical pressure from the plunger."  (Zheng Expert Report 12-13).  In other words, scratching does not constitute any part of her theory. Therefore, Ms. Zheng's failure to observe and reference actual scratches on the inner surface of the French Press does not undermine her expert opinion about mechanical stress from the plunger's expanded circumference.[4]

---

[4]   In a similar products liability case against Bodum involving the fracture of its coffee press, another court in this District admitted Ms. Zheng's expert opinion that "the plunger's protruding coil is what scratched the press' glass carafe and created crack initiation sites."  *Mullen* v. *Bodum USA, Inc.*, No. 23 Civ. 1166 (AT), 2025 WL 1735423, at *4 (S.D.N.Y. June 23, 2025).  In that case, there were actual "scratches and stainless steel residue found on the inside of the French press' glass carafe," which Ms. Zheng

Considering all three admissible components together, the Court also finds Ms. Zheng's overall conclusion that "[t]he subject French [P]ress failed as [a] result of defective glass [due to air bubbles present within the glass carafe] and a combination of mechanical and thermal stresses" to be admissible expert testimony. (Zheng Expert Report 13). The Court acknowledges Bodum's well-founded and recurrent criticism that Ms. Zheng "conducted no testing to determine whether any of these phenomena could sufficiently weaken the tensile strength of the glass to cause a fracture." (Def. Br. 21-22). The Court also recognizes that as a general matter, the scientific method is "based on generating hypotheses and testing them to see if they can be falsified[.]" *Daubert*, 509 U.S. at 593 (internal quotation marks omitted) (quoting Eric D. Green & Charles R. Nesson, Problems, Cases, and Materials on Evidence 645 (1983)); *see also Brooks* v. *Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (per curiam) ("The failure to test … can justify … exclusion of the expert's testimony."); *Colon ex rel. Molina* v. *BIC USA, Inc.*, 199 F. Supp. 2d 53, 78 (S.D.N.Y. 2001) (emphasizing "the importance of testing to ensure even a modicum of reliability"). But testing is not a dispositive legal requirement under either Rule 702 or the *Daubert* standard, and as the Court has already explained, the lack of testing here does not render Ms. Zheng's expert testimony inadmissible. *See, e.g.*, *Derienzo* v. *Trek Bicycle Corp.*, 376 F. Supp.

---

concluded came from the protruding coil without conducting any testing. *Id.* While there are obvious similarities between *Mullen* and this case, the Court notes that the plunger theory here focuses on mechanical stress rather than scratching. As a result, the lack of actual scratches and metal residues here is not dispositive.

20

2d 537, 559 (S.D.N.Y. 2005) (explaining that there may be sufficient reliability "despite a lack of empirical tests on the product that failed and no articulated hypothesis about the cause of failure").

Indeed, the Court excuses Ms. Zheng's lack of testing in this case because she examined the French Press; observed crack patterns, crack lines, and air bubbles that could conceivably support her conclusion about the combined effects of thermal and mechanical stress on defective glass; and cited scientific research to demonstrate that her theories are not so novel and unprecedented that real-world testing is required. *Cf. In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 6729295, at *7 (finding the lack of testing to be dispositive because there was no indication that the experts' theory could "occur[ ] in the real world"). Ms. Zheng's methodology, though perhaps not up to scientific par from Bodum's perspective, does not leave "too great an analytical gap between the data and the opinion proffered" in the Court's view, especially in light of her credentials and experience and the fact that she actually examined the French Press. *Joiner*, 522 U.S. at 146. Critically, the Court notes that Bodum does not dispute the scientific research underlying Ms. Zheng's theories that (i) thermal and mechanical stress can lead to glass fractures and (ii) air bubbles that are not properly removed during the manufacturing process can form defects that weaken the strength of borosilicate glass.

At bottom, Bodum's central issue with Ms. Zheng seems to be that her testimony simply pales in comparison to that of Bodum's expert. (*See, e.g.,*

21

Def. Br. 22 ("Unlike Bodum's expert Dr. Ganot, Ms. Zheng failed to conduct experiments like finite element analysis, thermal testing, or mechanical stress testing, any [of] which would have yielded reliable and falsifiable conclusions allowing her to confirm or reject her theories of defect.")).  The Court agrees that there is a stark contrast between the reports of the two experts, so much so that the jury may find it difficult to believe Ms. Zheng's testimony in light of Dr. Ganot's contrary report.  For example, Dr. Ganot performs calculations to demonstrate that "the magnitude of [the] stresses, even when combined, are substantially too low to cause the observed fracture" because the tensile strength of the glass is much higher.  (Ganot Expert Report 12, 18-19).  In addition, Dr. Ganot provides an alternative explanation based on his fracture analysis, namely that a single crack "at the outer lip of the carafe's top rim" was responsible for the fracture and that "[t]he crack originated at a pre-existing microscopic surface scratch on the outer lip of the rim, which was likely caused during use."  (*Id.* at 4-8).  But as Mr. Pape points out, "Bodum's argument on this point — simply claiming 'my expert is better than yours' — does not preclude an expert's testimony."  (Pl. Opp. 16).  The relative strengths and weaknesses of the experts' testimony are for the parties to explore on cross-examination and for the jury to weigh at trial, and not for the Court to exclude at this juncture.

Finally, the Court declines to exclude Ms. Zheng's expert testimony because of her apparent "failure to rule out obvious alternative causes of the fracture."  (Def. Br. 22).  It is unclear to the Court what the "obvious alternative

causes of the fracture" may be, as the experts disagree on whether the fracture originated on the inner or outer surface of the French Press, and Ms. Zheng's observations of internal crack patterns, cracks, and air bubbles support her internal theory of causation. Furthermore, "an expert need not rule out every alternative in forming an opinion[.]" *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 460 (S.D.N.Y. 2016); *see also Tardif* v. *City of New York*, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) (explaining that "an expert need not rule out every potential cause in order to satisfy *Daubert*" (internal quotation marks omitted) (quoting *Matthews* v. *Hewlett-Packard Co.*, No. 15 Civ. 3922 (DAB), 2017 WL 6804075, at *2 (S.D.N.Y. Dec. 22, 2017))).

### c.    Ms. Zheng's Expert Testimony Will Assist the Jury

Given the complexities of glass fractography, Ms. Zheng's expert testimony about the effects of thermal stress, air bubbles, and mechanical stress can help explain "how and why [the] French Press was defective" and caused Mr. Pape's injury. (Pl. Opp. 13). As to the matters of defect and causation, this Court is satisfied that her opinions "will assist the trier of fact" in making a decision in this case. *Nimely*, 414 F.3d at 397 (internal quotation marks omitted) (citing Fed. R. Evid. 702). In sum, because Ms. Zheng is qualified as an expert, her testimony is reliable, and it will assist the jury at trial, the Court allows her expert testimony to be admitted in this case.

**B.      The Court Denies Defendant's Motion for Summary Judgment**

      **1.      Applicable Law**

Under Rule 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Anderson*, 477 U.S. at 248). Furthermore, a particular fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The movant "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477 U.S. at 323). The movant can meet that burden in two ways: (i) by offering affirmative evidence that "demonstrate[s] the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, or, if the burden of proof would fall on the nonmovant at trial, (ii) by simply "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," *Jaramillo* v. *Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). Should the movant discharge that burden, the nonmovant must then "come forward with admissible evidence sufficient to

raise a genuine issue of fact for trial to avoid summary judgment." *Id.* This requires the nonmovant to "go beyond the pleadings, and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Flowers* v. *Conn. Light & Power Co.*, 774 F. App'x 33, 35 (2d Cir. 2019) (summary order) (internal quotation marks omitted) (quoting *Davis* v. *New York*, 316 F.3d 93, 100 (2d Cir. 2002)); *accord Parks Real Est. Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dall. Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Nevertheless, "[t]hough [the court] must accept as true the allegations of the party defending against the summary judgment motion, … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

### 2. There Are Genuine Disputes of Material Fact Regarding Defect and Causation That Preclude Summary Judgment

Under California law, which the parties agree applies in this case (Def. Br. 14; Pl. Opp.18), Mr. Pape's products liability claims share at least two common elements: defect and causation.  *See, e.g., Trejo* v. *Johnson & Johnson*, 220 Cal. Rptr. 3d 127, 140 (Cal. Ct. App. 2017) ("[U]nder either a negligence or a strict liability theory of products liability, to recover from a manufacturer, a

plaintiff must prove that a defect caused injury."). Bodum argues that it is entitled to summary judgment because Ms. Zheng's expert testimony must be excluded, and without "competent expert testimony, Plaintiff cannot establish the defect or causation elements of his claims under California law, regardless of the [specific] legal theory plead[ed]." (Def. Br. 14-15).

The Court disagrees, especially given that it has decided to admit Ms. Zheng's expert testimony.[5] On defect, Ms. Zheng opines that the air bubbles she has observed in the French Press constitute manufacturing defects that "compromise the integrity of the glass and degrade its overall performance under normal use." (Zheng Expert Report 9). In addition, she describes the protruding metal coil in the plunger as a "design defect … [that] creates extra pressure against the inside" of the French Press. (*Id.* at 11-12). And on causation, Ms. Zheng concludes that "[t]he subject French [P]ress failed as [a] result of defective glass and a combination of mechanical and thermal stresses." (*Id.* at 13). Viewed in the light most favorable to Mr. Pape as the non-moving party, Ms. Zheng's expert testimony is sufficient to raise a genuine issue of material fact over two elements common to all of Mr. Pape's causes of action. Therefore, the Court cannot grant summary judgment to Bodum.

---

[5]   Because the Court has ruled in favor of Mr. Pape on the issue of admissibility, it need not address the parties' dispute in the alternative on whether Mr. Pape can establish causation under California law without expert testimony. (*See* Pl. Opp. 18-19; Def. Reply 9-11).

26

## CONCLUSION

For the foregoing reasons, Bodum's motion to exclude the expert testimony of Ms. Zheng is DENIED, and Bodum's motion for summary judgment is DENIED.  The Clerk of Court is directed to terminate the pending motion at docket entry 39.

The parties are directed to file a joint letter proposing next steps on or before **April 10, 2026**.

SO ORDERED.

Dated:  March 27, 2026
       New York, New York

                              KATHERINE POLK FAILLA
                            United States District Judge